1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KWEKU ESHUN, et al., | CASE NO. 1:19-cv-00256-EPG |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT |
| v. | |
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, LOCAL 17,[1] | (ECF Nos. 22, 25) |
| | ORDER FOR CLERK TO UPDATE CAPTION |
| Defendant. | ORDER TO PARTICIPATE IN SETTLEMENT OR MEDIATION |

18    Plaintiff Kweku Eshun ("Plaintiff"), who is proceeding *pro se*, brought claims in state

19 court against Local Union Number 17, also known as United Steel, Paper and Forestry, Rubber,

20 Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO,

21 CLC, Local 17 ("USW") (collectively, these unions are referred to as the "Union" or "Local 17"

22 and are interchangeably referred to as "Defendant"), alleging that the Union failed to properly

23 represent him after his employer, Gallo Glass Company ("Gallo"), terminated his employment.

24 Defendant removed the action to this Court, claiming federal jurisdiction pursuant to the Labor

25
26
27
28

---

[1] The parties agree that the proper defendant in this action is United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC. Plaintiff does not deny that Defendant Local Union No. 17's proper name is United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Local 17. Accordingly, the Court will direct the Clerk of the Court to correct the docket to indicate that Local Union No. 17 is also known as United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, Local 17.

1   Management Relations Act ("LMRA").

2       The Court has before it the parties' cross-motions for summary judgment (ECF Nos. 22,

3   25). For the reasons discussed below, the Court grants, in part, and denies, in part, Defendant's

4   motion for summary judgment (ECF No. 22) and denies Plaintiff's motion for summary judgment

5   (ECF No. 25). The Court also orders the parties to participate in a settlement conference or

6   mediation.

7   **I.    BACKGROUND**[2]

8       Except as otherwise noted, the facts in the summary judgment record are undisputed.[3]

9       Plaintiff began working for Gallo in 2003 or 2004 as a utility worker in the warehouse

10   department and was later promoted to equipment operator. (ECF No. 22-1 at 2). Throughout his

11   employment with Gallo, Plaintiff was a member of the Union, which has been in a collective

12   bargaining relationship with Gallo since 1958. (*Id.* at 2-3). Plaintiff engaged in a physical

13   altercation with another employee on April 1, 2016, and Gallo suspended Plaintiff on April 25,

14   2016 as a result of that altercation. (*Id.* at 5-6). Plaintiff and Defendant challenged the termination

15   through the grievance process pursuant to Defendant's collective-bargaining agreement with

16   Gallo. (*Id.*). Union official David Hoffman represented Plaintiff at an arbitration hearing on

17   Plaintiff's termination on March 10, 2017. (*Id.* at 8). The arbitrator issued his decision that

18   declined to reinstated Plaintiff on May 18, 2017. (*Id.* at 10). Plaintiff filed this lawsuit against

19   Defendant on January 17, 2019.

20       **A.    2006-2007 interactions between Plaintiff and David Hoffman**

21       Hoffman began working for Gallo in 1985 and continued working there until he retired in

22   February 2020. (ECF No. 22-3 at 2-3). From November 1994 through November 2006, and from

23

24   [2] Document 22-1 is the joint statement of undisputed facts. Although this document bears Plaintiff's signature (*see id.* at 14), it appears that Plaintiff did not understand the nature of what he was signing and, as demonstrated by

25   Plaintiff's memorandum in support of summary judgment (ECF No. 25) and statement of disputed facts (see ECF No. 26), Plaintiff does not agree with much of the information included in the Union's joint statement. Specifically,

26   Plaintiff indicates that he does not agree with information in paragraphs 32-37, 40-41, 43-44, 48-49, 51-52, 55-61, and 65. (ECF No. 25 at 5.)

27   [3] To the extent the Court necessarily relied on evidence that has been objected to, the Court relied only on evidence it considered to be admissible.  Generally, it is not the practice of the Court to rule on evidentiary matters individually

28   in the context of summary judgment. Therefore, only some of the evidentiary objections have been individually ruled on.

May 2007, until he retired, Hoffman held full-time union positions that required him to take a union leave of absence from Gallo. (*Id.*). However, from November 2006 through May 2007, Hoffman did not hold a union position and instead worked full-time at Gallo as a coordinator in training with coordinator Alfred Albor. (ECF No. 22-1 at 11-12).

The coordinator is in charge of coordinating the workforce by assigning each employee on a given shift a workstation ("tank") and machine ("shop"). The schedule of assignments is then posted at the beginning of each shift. (*Id.*). As a coordinator in training, Hoffman assisted Albor in creating work schedules for the equipment operators and utility workers.

### 1. Plaintiff's Version of Negative Interactions with Hoffman

Plaintiff states the following interaction occurred between him and Hoffman:

> he attack me at the Gallo Glass plant when they removed me from equipment which I suppose to operate and put a white man whom I had seniority than and when I asked the supervisor why? Mr. Hoffman told me he will take me to the outside and fight me because why I asked that question.

(ECF No. 39 at 5).

### 2. The Union's Version

Defendant's version of a negative interaction between Hoffman and Plaintiff—and it is not clear whether this is the same interaction as the one Plaintiff discusses—is as follows:

A machine on tank 1 was not working, and Plaintiff, who was on tank 1, was the next person in rotation to operate the "non-working shop." Rather than bumping Plaintiff off to perform utility work and receive a lower rate of pay, Albor and Hoffman assigned Plaintiff to act as a "floater." That meant that Plaintiff was to assist other equipment operators on tank 1 but would receive his regular rate of pay rather than the lower utility worker rate and would have an easier workday. It also meant that no other equipment operator would be bumped out of their shop to perform utility work at a lower rate of pay. (ECF No. 22-1 at 12).

When Albor posted the work schedule, Plaintiff saw that he was assigned as a floater and became upset and yelled at Albor because he thought he was being assigned as a utility worker rather than an equipment operator and was thus being demoted and would receive less pay. (*Id.* at 13). Albor tried to explain to Plaintiff that he was not being demoted and would just have an easy

3

workday. (*Id.*). Plaintiff continued to yell at Albor that he wanted to operate a shop until Hoffman, who was sitting inside the office around the corner, walked out and said to Plaintiff something along the lines of: "What are you doing? We are giving you an easy day. If you are going to yell at someone, yell at me because it was my idea." (*Id.*). Plaintiff yelled back, "I am an equipment operator and want to operate." Hoffman replied, "I was trying to help you." Plaintiff threw his hands up and walked away. (*Id.*).

The interaction between Plaintiff and Hoffman lasted about 30 seconds. In the end, Plaintiff did operate a shop that day and the least senior operator took Plaintiff's assignment as a floater to assist equipment operators in tank 1. (*Id.*). Hoffman states that his assignment of Plaintiff as a floater had nothing to do with racism or discrimination. (ECF No. 22-3 at 7).

Hoffman was again hired by the Union in May 2007, "held full-time union positions that required [him] to take a union leave of abence from Gallo" until he retired in early 2020. (ECF No. 22-3 at 2-3).

As discussed below, in 2017, while working for the Union, Hoffman was the Union's representative that represented Plaintiff in an arbitration proceeding. Hoffman contends that he did not mention the 2007 incident with Plaintiff because he did not consider it significant or memorable and that he was reminded of the 2007 incident only when he read Plaintiff's complaint. (ECF No. 22-3 at 8).

**B.    April 2016 incident between Plaintiff and Derek Rose**

On April 1, 2016, Plaintiff and another employee, Derek Rose, had an altercation in Gallo's breakroom that resulted in both Plaintiff and Rose being terminated from their positions at Gallo.

On repeated occasions prior to this, Rose had engaged in certain behaviors, such as blowing kisses at Plaintiff, which Plaintiff did not like. Plaintiff called Rose "gay boy" in response. (ECF No. 22-1 at 4). Rose had also previously secretly recorded Plaintiff talking with another co-worker about some of the female workers, and Rose played that recorded conversation to the female workers in the breakroom. (ECF No. 38 at 3). Plaintiff had complained to the Union shop steward about this. (*Id.*). Plaintiff also asserts, and the Union admits, that although Plaintiff

1   has been a member of the Union for the entire time of his employment, Rose is not a union

2   member.

3        Then, "[o]n April 1, 2016, [Plaintiff and Rose] engaged in an altercation in the Company's

4   breakroom. [Plaintiff] was operating a machine a few feet away from the breakroom. Mr. Rose

5   was in the breakroom with other employees. [Plaintiff] was having trouble with his machine and

6   made a gesture towards the window of the breakroom to get Corey Sweetin's[4] attention so that

7   he could come help him with the machine." (ECF No. 22-1 at 3). Plaintiff "believes that Mr. Rose

8   blew kisses towards [Plaintiff] and gestured with his index and middle fingers rolled towards his

9   palm for [Plaintiff] to walk into the breakroom. [Plaintiff] interpreted the motion as an

10  inappropriate sexual gesture." (*Id.*). Plaintiff "then walked into the breakroom and grabbed Mr.

11  Rose by his chin and said, 'stop doing that.' He then let Mr. Rose go and walked out of the room.

12  Mr. Eshun left a red mark on Mr. Rose's face." (*Id.* at 4).[5]

13       **C.    Gallo's Response to the April 2016 incident**

14       Rose told another employee and shop steward Theresa Erickson about the altercation.

15  (*Id.*). According to Plaintiff, Rose then told Erickson not to report it to Gallo. (ECF No. 38 at 3).

16  However, Erickson did report it to Gallo. (ECF No. 22-1 at 4).

17       Gallo Human Resources Manager Jorian Reed interviewed Plaintiff and Rose separately,

18  with Erickson representing them as shop steward during the interviews. (*Id.*). Plaintiff told Reed

19  what happened—that he went inside the breakroom and grabbed Rose's chin and told Rose, "stop

20  doing that," because Rose had blown kisses at him and made a gesture. Gallo suspended both

21  Plaintiff and Rose on April 1, 2016, the same day that the altercation occurred. (*Id.* at 6).

22       **D.    Defendant Union Represents Plaintiff and Rose**

23       After Plaintiff was suspended but before his termination, then-Union president, Carlos

24  Contreras, attended a suspension hearing with Plaintiff. Suspension hearings are a negotiated

25  _____

26  [4] In a supplemental declaration, Plaintiff referred to Sweetin as Sweeney. (*See* ECF Nos. 22-1 at 5 (in joint statement of undisputed facts, stating Plaintiff sought "to get Corey Sweetin's attention" on April 1, 2016); 38 at 2 (Plaintiff declaring he "decided to call the chipper-checker Mr. Corey Sweeney . . . to come and help me run the equipment").

27  [5] This description comes from the Joint Statement of Undisputed Facts, but Plaintiff has indicated that he does not disagree with this summary. However, he does not clearly state what aspects of this summary are incorrect. To the extent Plaintiff identifies any differences, they do not affect the Court's decision herein.

28

1  process in Article 6.4 of the applicable Collective Bargaining Agreement ("CBA"). This

2  provision gives a suspended employee an opportunity to meet with a union representative and

3  Gallo to review the offense and facts concerning the suspension. In some cases, Gallo has agreed

4  to reinstate employees following these suspension hearings. (ECF No. 22-1 at 4).

5      The day of Plaintiff's suspension hearing, Contreras met with Plaintiff in advance of the

6  hearing and explained to Plaintiff the suspension hearing process. (*Id.* at 5). At the suspension

7  hearing, Contreras argued that Gallo violated Plaintiff's rights under Article 3.4 of the CBA

8  because it did not give Plaintiff union representation at the investigative meeting on April 1,

9  2016. Present at this meeting was the Plant Manager, Joe Majeski, as well as Reed, Contreras, and

10  Plaintiff. (*Id.*). On April 25, 2016, Gallo converted Plaintiff's and Rose's suspension pending

11  investigation into a suspension pending discharge, then terminated both Plaintiff and Rose for

12  violating Gallo's General Work Regulations and the Violence in the Workplace Policy. (*Id.*).

13      **E.    Grievance Process**

14      Shortly after Plaintiff was terminated, Contreras contacted Plaintiff and told him that the

15  Union would file a grievance with Gallo and explained the grievance process to Plaintiff. (*Id.*).

16  Under the CBA, Article 14, includes a multi-step grievance procedure, and Article 15 provides

17  that the grievance procedure culminates with binding arbitration before a neutral third-party

18  arbitrator. (*Id.*).

19      On April 26, 2016, Contreras filed grievances challenging the terminations of Plaintiff and

20  Rose. (*Id.* at 6). On May 10, 2016, Gallo's Director of Human Resources sent Contreras a letter

21  with Gallo's response (Step 2 of the grievance process), denying Plaintiff's grievance. (*Id.*). On

22  May 12, 2016, Contreras sent GMP International Representative and USW Staff Representative

23  David Hoffman a letter moving Plaintiff's grievance to Step 3. (*Id.*). This is the same David

24  Hoffman who had previously worked for Gallo and had the 2006-2007 negative interactions with

25  Plaintiff and who, as discussed below, ended up representing Plaintiff during arbitration.

26      In May or June 2016, Hoffman and Contreras met with Gallo for a Step 3 meeting and

27  advocated for Gallo to reinstate Plaintiff. Gallo denied Plaintiff's grievance at Step 3 and

28  Hoffman referred Plaintiff's grievance to Step 4 of the grievance procedure. (*Id.*).

On June 10, 2016, BMP International Vice President Brenda Scotland, Contreras, and Hoffman met with Gallo to discuss Plaintiff's grievance at Step 4 of the grievance procedure. On June 22, 2016, John Gallo, who was Gallo's Vice President, sent Scotland a letter denying Plaintiff's grievance at Step 4 of the grievance procedure. (*Id.* at 6). Throughout the grievance process, Contreras kept Plaintiff informed about the status of his grievance, explaining the various steps in the grievance process. (*Id.* at 7).

On July 5, 2016, Scotland sent John Gallo a letter moving Plaintiff's grievance to arbitration. (*Id.*). Plaintiff's and Rose's arbitration was scheduled for March 10, 2017 before arbitrator John Kagel. The Union sought reinstatement and backpay for both Plaintiff and Rose. (*Id.*)

In November 2016, Contreras resigned as president of the Union because he was hired by USW as staff representative. Vice president of the Union, Anthony Arceneaux, was then appointed as president of the Union to fulfill Contreras's duties for the remainder of a three-year term. (*Id.*)

From January 2017 to March 2017, Plaintiff called Arceneaux frequently to check in and ask if there were any updates on his case. David Hoffman, who served as the Union's advocate in the arbitration proceedings, decided to arbitrate Plaintiff's and Rose's grievances together. (*Id.* at 8).

**F.    Arbitration Proceeding**

The arbitration took place on March 10, 2017. The issue before the arbitrator was whether there was just cause for the termination of Plaintiff and Rose and, if not, what should be the remedy.

The Union asserts as follows: Hoffman decided to arbitrate Plaintiff's and Rose's grievances together because he thought it was in the best interest of the arbitrator to see that Plaintiff and Rose got along, had no hard feelings, and could continue to work together. (*Id.*). Hoffman believed Rose had the stronger case and hoped that arbitrating the two grievances together would make it more likely the arbitrator would order both employees reinstated. (*Id.*). Hoffman explained the arbitration process to Plaintiff and Rose and that he was going to advocate

1    for them both during the arbitration proceeding. (*Id.*).

2          Plaintiff asserts as follows: on March 10, 2017, Plaintiff met with Hoffman and

3    Arceneaux at the Union's office. Hoffman told Plaintiff that he and Rose should be nice to each

4    other to assist in their reinstatement. Hoffman knew that he had issues with Plaintiff before but

5    that he was the representative for Plaintiff now.

6          When the arbitration began, Gallo presented its case first, then Hoffman presented the

7    case for the Union. During the lunch break, prior to the second half of the arbitration hearing,

8    Hoffman invited Plaintiff, Rose, and Arceneaux out for lunch. Plaintiff and Rose expressed

9    nervousness about their upcoming testimony, and Hoffman told them that the arbitration was

10   going well, explained the evidence that had been presented by Gallo, and explained the questions

11   he would be asking them, the type of questions they may be asked on cross examination by

12   Gallo's lawyers, and how best to answer those questions. (ECF No. 22-1 at 9).

13         During the second half of the arbitration hearing, when the Union presented its case, both

14   Plaintiff and Rose testified. When Plaintiff testified, he recounted the events of April 1, 2016,

15   admitting that he took "hold [of Rose's] cheek" for "about . . . one minute or something like that."

16   (*Id.*). Hoffman advocated for both Plaintiff and Rose to be reinstated to their former positions at

17   Gallo on the ground that there was no just cause for their terminations.

18         Plaintiff asserts, however, that Contreras "asked that Mr. Derek Rose be returned to work,

19   that he was the victim and that no discipline was warranted in his situation." (ECF No. 39 at 4).

20   Plaintiff cites to "Exhibit A[,] arbitration transcript." (*Id.*). Exhibit B appears to be the exhibit

21   Plaintiff meant to reference. The speaker, who is not identified in the transcript page, includes the

22   sentence "The Union will also claim that Mr. Rose was simply the victim of Mr. Eshun's violent

23   act." (*Id.* at 11).

24         Defendant attached the full arbitration transcript to Hoffman's declaration. (*See* ECF Nos.

25   22-3 at 5 ("A true and correct copy of the arbitration transcript is attached hereto as Exhibit F.");

26   22-9 (Exhibit F)). The transcript shows that Emily Erdman appeared on behalf of Gallo. (ECF

27   No. 22-9 at 3). Ms. Erdman was the speaker on the page Plaintiff attached to his declaration.

28   (*Compare id.* at 18-19 *with* ECF No. 39 at 11).

1    "In the Union's post-hearing arbitration brief, Mr. Hoffman consistently argued that there

2  was no just cause for [Plaintiff's] termination, especially given [Plaintiff's] 13 years of service

3  and no record of formal written discipline of any type. Mr. Hoffman highlighted that [Gallo] has

4  repeatedly ignored physical and verbal assaults by other employees and had not terminated other

5  employees who violated [Gallo's] Violence in the Workplace policy. . . . Mr. Hoffman argued

6  that [Plaintiff's] actions did not rise to the just cause standard to support discharge and that the

7  proper remedy was to return both [Plaintiff] and Mr. Rose to work and make them whole." (ECF

8  No. 22-1 at 10).

9         **G.    Arbitration Judgment and After**

10        On May 18, 2017, the arbitrator issued his decision, reinstating Rose to his former

11 position at Gallo with backpay but declining to reinstate Plaintiff. (*Id.*). On or about May 19,

12 2017, Arceneaux called Plaintiff and told him that the arbitrator had decided to reinstate Rose but

13 to not reinstate Plaintiff. (*Id.*).

14        According to Plaintiff, Plaintiff asked Arceneaux for a copy of the arbitration decision on

15 May 19, 2017.  However, Arceneaux told Plaintiff that Hoffman had told Arceneaux only to tell

16 Plaintiff the outcome of the arbitration. (ECF No. 39 at 3).

17        Then on September 14, 2018, Plaintiff called Gallo human resources to ask for various

18 forms that would permit Plaintiff to appeal the arbitration. The human resources representative

19 advised Plaintiff to speak with the Union. Plaintiff spoke again with Arceneaux to sign certain

20 consent forms. Plaintiff asked for, and received, a copy of the arbitrator's decision the next day.

21 (*Id.*).

22        Plaintiff asserts, under penalty of perjury, that he then asked Arceneaux why Rose got his

23 job back but Plaintiff did not. "Arceneaux told me that it was Mr. David Hoffman told the Gallo

24 Glass Company and the Arbitrator not to reinstate my employment[.]" (ECF No. 39 at 3).

25        Arceneaux and Hoffman do not agree with Plaintiff's description. According to

26 Arceneaux, he mailed Plaintiff a copy of the arbitrator's decision on May 19, 2017. Then on

27 September 14, 2018, Plaintiff called Arceneaux who told Plaintiff he was suing Gallo and needed

28 a copy of the decision. Arceneaux mailed and emailed him another copy. Arceneaux avers that he

9

"never told [Plaintiff] that Mr. Hoffman told the arbitrator or the Company not to reinstate" Plaintiff. (ECF No. 22-12 at 4-5). Hoffman, likewise, denies telling "any representative of Gallo Glass or Arbitrator Kagel or anyone else, that [Plaintiff] should not be reinstated to his former position at Gallo Glass." (ECF No. 22-3 at 6).

### H.    Allegations of Discrimination and Harassment

Plaintiff makes several additional statements with respect to alleged racial discrimination and other harassment he encountered while working at Gallo, which is not a defendant in this case.

After the altercation with Rose but before being suspended, Plaintiff alleges that he and Rose were interviewed by the human resources manager Jorian Reed. After that,

> Contreras requested another interview from the company to interview Mr. Derek Rose and that interview was granted and Mr. Rose was interview[ed] for a second time and I think if the Union president Mr. Contreras made the company to interview Mr. Rose without me this is not fair to me and see these as discrimination against me and as Union president who supposed to represent the union members equal but he choose to be a prejudice against me and Mr. Carlos Contreras shows the same throughout the grievance process and only represent Mr. Rose and I have been saying this throughout that Mr. Rose is not a Union member but the Local Union choose to defend Mr. Rose because he is a white man and I am black man this is not what the Union stand for and this is a violation of public policy.

(ECF No. 38 at 4).  However, Defendant objects to Plaintiff's statement concerning Contreras causing Rose to be interviewed twice for lack of foundation and personal knowledge. (ECF No. 40 at 3). Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." There is no indication for how Plaintiff knows Contreras requested a second interview. For instance, he does not state that he saw Contreras bring Rose in for a second interview or that Contreras or anyone else told him Contreras did so. Therefore, the Court sustains this objection. *See In re Worlds of Wonder Sec. Lit.*, 35 F.3d 1407, 1420 n. 4 (9th Cir.1994) (excluding declaration because the author lacked personal knowledge of the facts contained therein).

///

1       The joint statement of undisputed facts states that Contreras did not harm Plaintiff. (ECF

2    Nos. 22-1 at 14) ("Mr. Plaintiff Contreras and Mr. Arceneaux never did anything to wrong Mr.

3    Eshun."). This statement cites to Plaintiff's deposition, where he stated that Contreras did not

4    wrong him from the time of the incident with Rose onward:

5           Q. . . . From the time of the incident that for which you were terminated, from that
            time onward, did Carlos Contreras do anything to wrong you as far as you know?
6           A.  No, he didn't do anything wrong me.

7    (ECF No. 22-23 at 36).

8       Plaintiff also states that other Gallo employees got in physical fights but were not

9    terminated:

10
            There had been the same incident at Gallo Glass Company which those people
11          fought each other and those were not terminated from the company and those
            people were represented by the Union during that time. ( Exhibit C, the
12          declaration transcript from attorney for Gallo Glass.) Mr. Ivyn Kotcher and Mr.
            Gary altercation happened on 2015 and our altercation happened 2016 and Mr.
13          Ivyn Kotcher and Mr. Gary made a physical fight and Ms. Gloria Bajaras and Ms.
            Elma also had a physical fight to each other and none of these employees were
14          terminated from Gallo Glass Company and the Union representative Mr. David
            Hoffman wrote in his testimony that I had a weak case and the Union attorney
15          Ms. Antonia Domingo made the same argument during the June 5, 2020
            conference called hearing that my case is weak. I would like to Know from the
16          Local Union and Ms. Domingo which Union represented those employees and
            who was the representative? So the Plaintiff alleges that the defendant Local
17          Union failed to represent me from April 1, 2016 throughout the grievance process
            and also Arbitration hearing, I kweku Eshun the Plaintiff make this assertion of
18          fact to the Local Union that, the Union Discriminate and Wrongful Terminate my
            Employment from Gallo Glass Company because of my race and my Nationality
19          and this is violation of public policy under California law.
20
21    (ECF No. 39 at 5-6) (as in original).

22       Exhibit C to docket number 39 appear to be responses to requests for admission. There,

23    Defendant made the following admissions:

24
            1. Admit that Bruce Williams, Sr. Manager, Operations, oversaw plant operations
25          at Gallo Glass Company on the date that you allege that Maria Barajas had a
            physical altercation with Ms. Elma.
26
            2. Admit that Joe Majewski did not oversee plant operations at Gallo Glass
27          Company on the date that you allege that Maria Barajas had a physical altercation
            with Ms. Elma.
28

1

2

3

    3. Admit that you do not know the identities of anyone who was involved in any decision to discipline or not discipline Maria Barajas for the physical altercation that you allege she had with Ms. Elma.

4

5

    4. Admit that you do not know the identity of the supervisor Maria Barajas had on the date that you allege she had a physical altercation with Ms. Elma.

6

(*Id.* at 14-15).

7

8

9

10

11

12

    Plaintiff also stated in his declaration that there is sexual harassment at Gallo. Between 2006 and 2007, Sweetin got naked and exposed his anus to Plaintiff while Plaintiff was working. Plaintiff told Ms. Donna Sanders about it and she talked to Sweetin about the behavior. Sweetin exposed his penis to Plaintiff on another occasion when two women were present. This behavior "is harassment and its indecency and its immoral and all this attitude the Union leaders aware of it." (ECF No. 38 at 4-5).

13

14

15

16

    Various times, "Rose asked me he want African anaconda which means he want Africa pennis," and Plaintiff states that others "want that . . . as well[.]" (*Id.* at 5). Plaintiff states that he "think[s] this kind of behavior is harassment" and that Gallo had a harassment policy and a violence policy. (*Id.*).

17

    **I.**    **Administrative Complaints**

18

19

20

21

22

23

24

25

26

27

28

    "Plaintiff filed a discrimination complaint with the Department of Fair Employment and Housing ('DFEH')" on March 24, 2017. (ECF No. 22-1 at 14). Although the joint statement of undisputed facts states that Plaintiff also filed another discrimination complaint with the EEOC on May 22, 2017, (*id.*, citing Plaintiff's deposition) it appears that the DFEH sent that complaint to the EEOC on that date, (ECF Nos. 22-23 at 47 (at deposition, Plaintiff testifying that he filed one complaint and the DFEH sent the complaint to the EEOC); 22-25 at 2 (EEOC filing noting the complaint had "has been received by . . . The [DFEH] and sent to the EEOC for dual filing purposes")). The parties agree that the administrative complaints "nam[e] Gallo Glass Company as a respondent and Mr. Majewski, the plant manager, and Mr. Contreras as co-respondents. Plaintiff did not name [the Union in its current or previous forms] or Mr. Hoffman as respondents

///

or co-respondents." (ECF No. 22-1 at 14).[6]  Notably, none of these respondents are defendants in this case.  The Union, who is the defendant in this case, was not named in the discrimination complaint.

The relevant portion of Plaintiff's complaint with the DFEH states as follows:

1. I, Kweku Eshun, allege that I was subjected to Discrimination, Harassment by respondent, Gallo Glass Company due to one or more Fair Employment and Housing Act protected, bases: National Origin - Including language use restrictions, Race.

2. I was Denied a work environment free of discrimination and/or retaliation, Terminated. The most recent harm occurred, on or around August 25, 2016.

3. My belief is based on the following: On August 25, 2016,1 was terminated from my position as an equipment operator. From January 2011 through April 5, 2016,I was subjected to ongoing harassment by Utility Worker, Derrick Ross [sic]. This harassment included but was not limited to. Derrick taking pictures of me without my knowledge, recording me, and blowing kisses at me. I made an internal complaint to Shop Steward, Teliza (LNU) regarding the ongoing harassment. I was told he would be talked to but nothing was done. On April 5, 2016, Derrick and I were involved in a verbal altercation. On August 25, 2016,1 was called into the office and told I was being terminated. The reason given was that I violated a no tolerance policy however, non-African employees with the same or similar infractions were not terminated. I believe I was terminated due to my Race (African American) and National Origin (African).

(ECF No. 22-24 at 7-8) (fixing error in page order).

**J.      The Present Action**

On January 17, 2019, Plaintiff initiated the present action by filing a complaint against the Union in Stanislaus County Superior Court. (ECF No. 1-1). The complaint alleges state law claims for discrimination, breach of contract, and wrongful termination in violation of public policy. (*Id.*). Gallo is not a party. At oral argument, Plaintiff stated he filed an additional action in state court against Gallo, which was dismissed.[7]

---

[6] The joint statement cites to Plaintiff's deposition. (*Id.*). According to Plaintiff's deposition, he filed only one. (ECF No. 22-23 at 47) ("A. So I didn't file two cases, only one."). Whether it is the same complaint or two different ones does not change the relevant aspect of the Court's analysis.

[7] The Court takes judicial notice of *Eshun v. Gallo Glass Company*, No. Cv-19-000301, Superior Court of California, County of Stanislaus. Fed. R. Evid. 201; *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007) (stating that courts "may take [judicial] notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."). On March 10, 2020, the court granted Gallo's motion for summary judgment, and on March 11, 2020, the court entered its judgment. *Eshun v. Gallo*, docket entries dated March 10, 2020 and March 11, 2020.

On February 22, 2019, the Union removed the action to federal court on the basis of federal question jurisdiction under 28 U.S.C. § 1331. Specifically, the Union contends that although Plaintiff styles his claims as state-law claims, those claims arise under and are preempted by § 301 of the Labor Management Relations Action.

On March 20, 2020, the Union filed a motion for summary judgment (ECF Nos. 22, 23, 28, 29) and on March 30, 2020, Plaintiff filed a cross-motion for summary judgment (ECF Nos. 25, 26, 32). On June 5, 2020, the Court held a telephonic hearing on the motions at which Plaintiff appeared *pro se*, and the Union appeared through counsel Antonia Domingo. (ECF No. 31). The Court allowed the parties to file supplemental briefs to address the legal standards for conflicts of interest in union cases. (*Id.*). The Union filed its supplemental brief on June 17, 2020 (ECF No. 33); Plaintiff filed his supplemental brief on June 22, 2020 (ECF No. 35). On August 28, 2020, the Court informed Plaintiff that he failed to support his motion for summary with admissible evidence. (ECF No. 37). Plaintiff filed two declarations, in the form of motions, on September 30, 2020. (ECF Nos. 38 & 39). Defendant filed evidentiary objections to those declarations on October 13, 2020. (ECF No. 40).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (en banc) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings,

14

1    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

2    any,' which it believes demonstrate the absence of a genuine issue of material fact*." Celotex*

3    *Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). If the moving party

4    moves for summary judgment on the basis that a material fact lacks any proof, the court must

5    determine "whether a fair-minded jury could reasonably find for the [non-moving party]."

6    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of

7    evidence in support of the plaintiff's position will be insufficient; there must be evidence on

8    which the jury could reasonably find for the plaintiff."). "[A] complete failure of proof

9    concerning an essential element of the nonmoving party's case necessarily renders all other facts

10   immaterial." *Celotex*, 477 U.S. at 322. "[C]onclusory allegations unsupported by factual data" are

11   not enough to rebut a summary judgment motion. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.

12   1989) (citation omitted).

13        In reviewing a summary judgment motion, the Court may consider other materials in the

14   record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v.*

15   *San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

16        In judging the evidence at the summary judgment stage, the Court "must draw all

17   reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros*

18   *de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only

19   draw inferences, however, where there is "evidence in the record . . . from which a reasonable

20   inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact.

21   *Celotex*, 477 U.S. at 330 n.2. But, "if direct evidence produced by the moving party conflicts with

22   direct evidence produced by the nonmoving party, the judge must assume the truth of the

23   evidence set forth by the nonmoving party with respect to that fact." *Leslie v. Grupo ICA*, 198

24   F.3d 1152, 1158 (9th Cir. 1999) (citation omitted).

25   **III.    DISCUSSION**

26        **A.    Preemption by § 301 of the LMRA**

27        Defendant contends that Plaintiff's state law claims are subsumed by the Union's duty of

28   fair representation and that the claims are therefore completely preempted by § 301 of the LMRA.

15

1   (ECF No. 23 at 12-15).

2       In relevant part, section 301 states:

3       Suits for violation of contracts between an employer and a labor organization
        representing employees in an industry affecting commerce as defined in this
4       chapter, or between any such labor organizations, may be brought in any district
        court of the United States having jurisdiction of the parties, without respect to the
5       amount in controversy or without regard to the citizenship of the parties.

6   29 U.S.C. § 185(a).

7       "[T]he preemptive force of § 301 [of the LMRA] is so powerful as to displace entirely any

8   state cause of action for violation of contracts between an employer and a labor organization. Any

9   such suit is purely a creature of federal law, notwithstanding the fact that state law would provide

10  a cause of action in the absence of § 301." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers*

11  *Vacation Tr. for S. Cal.*, 463 U.S. 1, 23 (1983) (internal quotation marks and footnote omitted).

12  Section 301 also preempts any state law claim that is "'substantially dependent upon analysis of

13  the terms of an agreement made between the parties in a labor contract.'" *Adkins v. Mireles*, 526

14  F.3d 531, 539 (9th Cir. 2008) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)).

15  Thus, for example, a claim for intentional infliction of emotional distress that requires

16  interpretation of an employer's reasonableness, which in turn requires interpretation of the

17  applicable CBA, is preempted by § 301. *See Miller v. AT&T Network Svs.*, 850 F.2d 543, 549 (9th

18  Cir. 1988). Put another way, § 301 preempts any state law claim the resolution of which relies on

19  the meaning of a CBA even if the state law claim does not allege violation of the CBA. *Id.*

20      On the other hand, "[i]f a state law cannot be waived or modified by private contract, and

21  if the rights it creates can be enforce without resort to the particular terms, express or implied, of

22  the labor contract, the LMRA does not preempt a claim for violation of the law." *Soremekun v.*

23  *Thrifty Payless, Inc.*, 509 F.3d 978, 990 (9th Cir. 2007). In other words, § 301 "does not grant the

24  parties to a collective bargaining agreement the ability to contract for what is illegal under state

25  law. . . ." *Id.* (quoting *Allis-Chalmers*, 471 U.S. at 212). Thus, there is a distinction "between state

26  laws that require interpretation of a labor contract and those that prohibit parties from including

27  particular terms in such a contract." *Id.* State law claims are not preempted when the court is

28  simply required to apply the terms of a CBA; they are preempted only when the court must

16

interpret the provisions of the CBA. *Id.*

The Ninth Circuit has articulated a two-pronged test for determining whether § 301 preemption applies. *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059-60 (9th Cir. 2007). First, a court must determine "whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA. If the right exists solely as a result of the CBA, then the claim is preempted and our analysis ends there." *Id.* at 1059. If, however, the right underlying the state law claim(s) "exists independently of the CBA" the court must proceed to the second prong and consider whether the right is nevertheless "substantially dependent on analysis of a collective bargaining agreement." *Id.* (internal quotation marks omitted). "If such dependence exists, then the claim is preempted by § 301; if not, then the claim can proceed under state law." *Id.* at 1059-60.

Claims under FEHA are generally not preempted by the LMRA. *See Ramirez v. Fox Television Station, Inc.*, 998 F.2d 743, 748 (9th Cir. 1993) ("In every case in which we have considered an action brought under the California Employment Act, we have held that it is not preempted by section 301."); *Schrader v. Noll Mfg. Co.*, 91 F. App'x 553, 555 (9th Cir. 2004) (unpublished) ("We have consistently held that state law discrimination claims under the FEHA do not require courts to interpret the terms of a CBA and are therefore not preempted by § 301."); *Detabali v. St. Luke's Hosp.*, 482 F.3d 1199, 1203 (9th Cir. 2007) ("We see no need to depart from a long line of our cases holding that FEHA employment discrimination claims are not ipso facto preempted by § 301 of the LMRA."). Moreover, "reference to or consideration of the terms of a collective-bargaining agreement is not the equivalent of interpreting the meaning of the terms." *Ramirez* at 749.

When an employee's claim is preempted, "most often 'that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law.'" *Kobold v. Good Samaritan Regional Med. Ctr.*, 832 F.3d 1024, 1034 (9th Cir. 2016) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)).

Here, Plaintiff brings claims under state law for breach of contract, discrimination, and wrongful termination in violation of public policy. The Union argues that because Plaintiff's

1    claims concern the Union's handling of the grievance and arbitration challenging Gallo's

2    termination of Plaintiff, that this is "exactly the sort of suit that may be brought only as a claim

3    for breach of the duty of fair representation" and that all of Plaintiff's claims are therefore

4    preempted by § 301. (ECF No. 23 at 14).

5         As discussed below, Plaintiff's claims for breach of contract and discrimination in

6    violation of the CBA are preempted by § 301, but Plaintiff's FEHA claim for discrimination

7    against the Union is not.

8                    1.      Breach of Contract Claim

9         Plaintiff's breach of contract claim alleges that the Union violated its duties by advocating

10   for the interests of Rose to get his job back over the interests of Plaintiff to get his job back,

11   including characterizing Rose as the victim of Plaintiff's violent conduct. Plaintiff claims that, for

12   example, during the arbitration hearing, Hoffman asked him some questions with the wrongful

13   intent of getting Rose his job back but not getting Plaintiff's job back. Plaintiff also claims that

14   Hoffman told Gallo and the arbitrator off the record to reinstate Rose but uphold his termination.

15        The breach of contract claim relates directly to the duties of the union under the CBA,

16   including the duty of fair representation. This duty exists solely as a result of the CBA and

17   requires interpretation of the CBA. Accordingly, the claim is preempted by § 301. *See Burnside*,

18   491 F.3d at 1059-60; *Jackson v. S. California Gas Co*., 881 F.2d 638, 643 (9th Cir. 1989) (cause

19   of action for breach of contract "is clearly preempted" by § 301); *Newberry v. Pac. Racing Ass'n*,

20   854 F.2d 1142, 1146 (9th Cir. 1988) ("A suit for breach of a collective bargaining agreement is

21   governed exclusively by federal law under section 301.").

22        As such, as the Union urges, (*see* ECF No. 23 at 12), the Court will treat this claim as a

23   breach of the duty of fair representation under § 301. *See Adkins*, 526 F.3d at 540 (finding

24   plaintiff's breach of contract claim preempted and displaced by section 301).

25                    2.      Discrimination Claims

26        Plaintiff's complaint lists two causes of action for discrimination. (ECF No. 1-1 at 2-3). It

27   appears that, at times, Plaintiff has alleged the discrimination claims were for discrimination

28   based on race and national origin. (ECF No. 22-24 at 7-8) (Plaintiff's administrative agency

1  complaint alleging that he "believe[s] [he] was terminated due to my Race (African American)

2  and National Origin (African)"); (ECF No. 1-1 at 4) (in complaint's portion concerning wrongful

3  termination in violation of public policy, "The above -described conduct of defendants constitutes

4  Racial discrimination, and Retaliation of speaking truth about wrongful attitude which violate

5  your right, And wrongful termination of plaintiff in violation of public policy embodied in the

6  FEHA."); (*see also* ECF No. 39 at 5) (Plaintiff averring that Hoffman "chose to defend Mr. Rose

7  because he is white man and I am black man from Africa").

8        Reading Plaintiff's complaint and motions liberally, his claims appear to fall into two

9  categories. The first category is that the alleged bias and discrimination violates duties owed

10  under the CBA. (ECF No. 32 at 2) ("I think the Union job is to protect the members right of any

11  circumstances not to throw the member on board That's wrong no matter what that person may

12  be."). The second category arises under FEHA. (*See* ECF No. 1-1 at 4) (listing "Racial

13  discrimination" and referencing "FEHA" in complaint).[8]

14        Plaintiff's first claim—concerning alleged bias and discrimination by Defendant in

15  connection with duties it owes under the CBA—is based on, and will require interpretation of, the

16  CBA and is therefore preempted by § 301. *See Burnside*, 491 F.3d at 1059-60; *Jackson*, 881 F.2d

17  at 643; *Newberry*, 854 F.2d at 1146.

18        Plaintiff's FEHA claim is not. This action is comparable to *Guidry v. Marine Engineers'*

19  *Beneficial Association*. 2007 WL 707511 (N.D. Cal. Mar. 6, 2007).  There, Guidry alleged his

20  union improperly processed his grievance in violation of FEHA. After a detailed discussion of

21  preemption, *id.* at *3-6, the court found no preemption there: although "Plaintiff's [FEHA] claim

22  for retaliation rests upon a theory that requires some reference to his contractual relationship with

23  the union," the claim did not require interpreting the collective-bargaining agreement. *Id.* at *6.

24        Just as Guidry alleged his union improperly processed his grievance in violation of FEHA,

25  so too does Plaintiff. As in *Guidry*, the Court will not need to interpret the CBA to consider

26  Plaintiff's claim. Thus, Plaintiff's FEHA claim that Defendant and its representatives defended

27
28  [8] Although Plaintiff does not name any particular portion of FEHA, the Court will analyze Plaintiff's claim under California Government Code § 12940(b), which makes it unlawful "[f]or a labor organization, . . . because of the race, . . . color, [or] national origin . . . to discriminate in any way against any of its members . . . .").

1   and advocated for Rose over Plaintiff as a result of racial discrimination is not preempted. *See*

2   *also Ramirez*, 998 F.2d at 748 ("Fox also argues that our prior cases are distinguishable because

3   those cases did not require us to 'reference' any bargaining agreements, and here we will have to

4   'consider' the Bargaining Agreement. Preemption is appropriate, however, only when the

5   provisions of a collective-bargaining agreement must be interpreted.").

6                   3.      Wrongful Termination in Violation of Public Policy

7           Plaintiff's complaint also purports to bring a claim for wrongful termination. Plaintiff's

8   alleges that he was terminated and not reinstated as a result of racial discrimination and in

9   retaliation for Plaintiff "speaking truth about wrongful attitude" and that this was a violation of

10  public policy embodied in the California Fair Employment and Housing Act ("FEHA").

11          However, the entity that terminated him, i.e., Gallo, is not a party in this lawsuit.  *See*

12  *Weinbaum v. Goldfarb, Whitman & Cohen*, 46 Cal. App. 4th 1310, 1315 (1996) ("[T]he duty on

13  which the tort [of wrongful termination in violation of public policy] is based is a creature of the

14  employer-employee relationship, and the breach of that duty is the employer's improper discharge

15  of an employee otherwise terminable at the will or whim of the employer."); 3 Witkin, Summary

16  11th Agency § 257 (2020) ("Generally, only an employer may be sued for wrongful termination

17  of employment in violation of public policy, because the tort does not impose a duty on anyone

18  other than the employer, given that only an employer can discharge an employee.").

19          Thus, although Plaintiff's allegations of wrongful discharge may be a necessary feature of

20  Plaintiff's claims under the LMRA, as discussed below, *see Snyder v. Consol. Freightways, Inc.*,

21  15 F.3d 1089 (9th Cir. 1994) (table) ("To prevail on a claim against a union for breach of its duty

22  of representation, the plaintiff must prove that the duty was breached and that the underlying

23  grievance would have been meritorious." (citing *DelCostello v. International Brotherhood of*

24  *Teamsters,* 462 U.S. 151, 165 (1983))); *accord Billingsley v. MV Transportation, Inc.*, 242 F.

25  Supp. 3d 1011, 1019 (E.D. Cal. 2017) (citing *DelCostello*), it is not a separate cause of action

26  against the Union and is not relevant for purposes of preemption.[9]

27  ---
     [9] To the extent Plaintiff did intend his claim for wrongful termination as a separate cause of action, such a claim
     would also be subject to summary judgment because the Union was not the entity that terminated Plaintiff's
28   employment.

1           4.     Conclusion

2         Plaintiff's claim for breach of contract is preempted by § 301. Plaintiff's claims for

3 discrimination are preempted by § 301 to the extent that these claims contend that the Union's

4 actions and those of the Union's representatives violated the Union's duties under the CBA.

5 Therefore, the Court will treat those claims as ones for breaches of the duty of fair representation.

6         However, Plaintiff's claim that the Union violated California state law prohibiting racial

7 discrimination when the Union defended Rose and advocated for the interests of Rose over

8 Plaintiff on the basis of Plaintiff's race is not preempted by § 301. The Court will review that

9 claim under the relevant state law.

10     **B.**     **Statute of Limitations of LMRA Claims**

11         Defendant next argues it is entitled to summary judgment on Plaintiff's LMRA claim

12 against it because Plaintiff's LMRA claims are barred by the six-month statute of limitations.

13 (ECF No. 23 at 15).

14         1.     Legal Framework

15         The statute of limitations for lawsuits brought against a union for breaching the duty of

16 fair representation is six months. *Moore v. Local Union 569 of Int'l Bhd. of Elec. Workers*, 989

17 F.2d 1534, 1541 (9th Cir. 1993), *as amended* (June 28, 1993) (citing *DelCostello v. Int'l Bhd. of*

18 *Teamsters,* 462 U.S. 151, 172 (1983)). "[W]here a duty of fair representation suit seeks to

19 overturn an unfavorable arbitration award on the ground that the union committed errors in the

20 arbitration proceedings, the claim accrues when the employee learns of the arbitrator's award."

21 *Galindo v. Stoody Co*., 793 F.2d 1502, 1509 (9th Cir. 1986).

22         However, the statute of limitations can be tolled for various reasons. One such reason is

23 fraudulent concealment. "The following elements are required to toll a statute of limitations on

24 the basis of fraudulent concealment: (1) fraudulent concealment by the party raising the statute of

25 limitations defense; (2) the other party's failure to discover the facts that are the basis for a cause

26 of action despite (3) the exercise of due diligence." *Eason v. Waste Mgmt. of Alameda Cty.*, No.

27 C-06-06289JCS, 2007 WL 2255231, at \*6 (N.D. Cal. Aug. 3, 2007) (citing *NLRB v. Don Burgess*

28 *Const. Co.*, 596 F.2d 378, 383 n.2 (9th Cir. 1979)); *accord Hexcel Corp. v. Ineos Polymers, Inc.*,

1   681 F.3d 1055, 1060 (9th Cir. 2012) ("The plaintiff carries the burden of pleading and proving

2   fraudulent concealment; it must plead facts showing that the defendant affirmatively misled it,

3   and that the plaintiff had neither actual nor constructive knowledge of the facts giving rise to its

4   claim despite its diligence in trying to uncover those facts." (cleaned up)); *Thibodeaux v.*

5   *Teamsters Local 853*, 263 F. Supp. 3d 772, 778 (N.D. Cal. 2017) (quoting *Hexcel* in section 301

6   action).

7                      2.       Plaintiff's LMRA Claims

8          Defendant argues that Plaintiff "knew on May 19, 2017 that the arbitrator had ruled

9   against him and denied his grievance. But he did not file his Complaint until January 17, 2019,

10  almost 20 months after his cause of action accrued," rendering Plaintiff's complaint untimely.

11  (ECF No. 23 at 15).

12         There are five basic allegations concerning Defendant's alleged wrongdoing: (1) Hoffman

13  called Rose the victim of Plaintiff's violent act in front of the arbitrator, (2) Hoffman represented

14  both Rose and Plaintiff at the arbitration proceeding, (3) Hoffman discriminated against Plaintiff

15  on account of his race, (4) Hoffman did not like Plaintiff, and (5) Hoffman told Gallo and the

16  arbitrator off the record to reinstate only Rose.

17                      a)       *Claims Other Than Hoffman's Off-the-Record Comments*

18         Plaintiff provides no reason to toll the first four allegations.  Under the law cited above,

19  the claim relying on those facts accrued on the day Plaintiff learned of the arbitrator's decision,

20  which was May 19, 2017. The statute of limitations for those claims expired the first business day

21  six months later: November 20, 2017.[10] Plaintiff filed his complaint on January 17, 2019, which

22  was nearly 14 months after the statute of limitations expired.

23         Moreover, Plaintiff has not asserted any basis for tolling or fraudulent concealment

24  regarding these allegations.  The facts underlying these allegations occurred, and were known to

25  Plaintiff, before May 19, 2017.  There are no facts establishing concealment by Defendant as to

26  those facts.

27  ///

28          _____
            [10] November 19, 2017 was a Sunday.

1    As such, the Court will grant summary judgment to Defendant on Plaintiff's LMRA claim

2  to the extent it is based on the underlying allegations that (1) Hoffman called Rose the victim of

3  Plaintiff's violent act in front of the arbitrator, (2) Hoffman represented both Rose and Plaintiff at

4  the arbitration proceeding, (3) Hoffman discriminated against Plaintiff on account of his race, and

5  (4) Hoffman did not like Plaintiff. *See Galindo*, 793 F.2d at 1509.

6              *b)      Claim Concerning Hoffman's Off-the-Record Comments*

7    Plaintiff alleged that he did not learn that Hoffman told Gallo and the arbitrator off the

8  record to reinstate only Rose until after May 19, 2017.  Specifically, Plaintiff alleges that on

9  September 14, 2018, Plaintiff asked Arceneaux why Rose got his job back but he did not.

10  "Arceneaux told me that it was Mr. David Hoffman told the Gallo Glass Company and the

11  Arbitrator not to reinstate my employment[.]" (ECF No. 39 at 3).

12    Construing this allegation as true for purposes of summary judgment only, the Court finds

13  that Plaintiff is entitled to tolling as to this specific allegation only.  Again, "[t]he following

14  elements are required to toll a statute of limitations on the basis of fraudulent concealment: (1)

15  fraudulent concealment by the party raising the statute of limitations defense; (2) the other party's

16  failure to discover the facts that are the basis for a cause of action despite (3) the exercise of due

17  diligence." *Eason*, 2007 WL 2255231 (citing *NLRB v. Don Burgess Const. Co.*, 596 F.2d 378,

18  383 n.2 (9th Cir. 1979)).  Here, Plaintiff's alleges that Defendant's representative, Hoffman,

19  stated off the record, and outside Plaintiff's hearing, something contrary to what he was saying on

20  the record, *i.e.*, that the arbitrator should not reinstate him.  This, if true, indicates that Defendant,

21  acting through Hoffman, concealed the fact; that Plaintiff failed to discover the fact until

22  September 14, 2018; and Plaintiff sufficiently exercised due diligence. Plaintiff is thus entitled to

23  tolling until that date.

24    In Defendant's motion papers and at oral argument, Defendant failed to explain why the

25  statute of limitations bars an LMRA claim based on this specific allegation. Instead, Defendant

26  challenged this allegation on the grounds that it is based on inadmissible hearsay and is contrary

27  to the evidence.

28  ///

23

i.    Hearsay

"'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c) (paragraph breaks omitted). "Hearsay is not admissible" unless it falls within an exception to the rule. Fed. R. Evid. 802.

However, a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship while it existed[.]" Fed. R. Evid. 801(d)(2). "This rule requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment." *Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 821 (9th Cir. 2002).

"Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805.

Here, Plaintiff declares that "Mr. Arceneaux told me on September 14, 2018 that Mr. David Hoffman who told Gallo Glass Company and arbitration not to reinstate me . . . ." (ECF No. 39 at 4-5). Both Arceneaux and Hoffman are agents of the opposing party, *i.e.,* Defendant. (ECF Nos. 22-12 at 5 (Arceneaux's declaration that he was Defendant's president); 22-3 at 3-4 (Hoffman's declaration that as international representative to Defendant, he was Plaintiff's representative at arbitration)). Moreover, the statement relates to a matter within the scope of each agent's employment, *i.e.*, the Union's representation of Plaintiff against Gallo.  Therefore, this allegation is not hearsay when used against Defendant because the two statements referenced are admissions of party opponent. *See* Fed. R. Evid. 801(d)(2)(D).  Defendant's objection to this evidence is overruled for purposes of this motion for summary judgment.

ii.    Genuine Dispute of Material Fact

Next, Defendant argues that Plaintiff's claim that he heard this statement does not create a genuine dispute of material fact for two reasons.

First, Defendant submits evidence from both Arceneaux and Hoffman denying that they made the alleged statements. (ECF Nos. 22-12 at 5 (Arceneaux declaring: "In all my

1   conversations with Mr. Eshun, I never told Mr. Eshun that Mr. Hoffman told the arbitrator or the

2   Company not to reinstate Mr. Eshun."); 22-3 at 6 (Hoffman declaring: "Never did I say, to any

3   representative of Gallo Glass or Arbitrator Kagel or anyone else, that Mr. Eshun should not be

4   reinstated to his former position at Gallo Glass.")). However, Plaintiff has also proffered

5   admissible evidence to the contrary, in the form of his declaration under penalty of perjury (ECF

6   No. 39 at 3 (statement), 7-8 (declaration of personal knowledge of facts under perjury)).  Courts

7   "view the evidence in light most favorable to the non-moving party. Where disputed facts exist,

8   the plaintiff's representations of these facts are assumed to be correct for the purposes of deciding

9   [the defendant's] summary judgment motion." *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1177

10  (9th Cir. 2016) (citations omitted). Thus, notwithstanding Arceneaux's and Hoffman's denials,

11  the Court finds there is a dispute of fact precluding summary judgment.

12       Second, Defendant argues that "Mr. Hoffman zealously advocated for Mr. Eshun

13  throughout the process," and "no rational factfinder could conclude that Local 17 breached its

14  duty of fair representation by telling an unidentified 'someone' not to reinstate Mr. Eshun." (ECF

15  No. 23 at 22). The Court disagrees with Defendant's conclusion. Unlikely or not, it is plausible

16  that a union official, finding one case stronger than another, would tell an arbitrator off the record

17  to reinstate the employee with the stronger case.  The Court does not find that the allegation is so

18  implausible that it can be disregarded for purposes of summary judgment

19                          *c)*      *Conclusion*

20       Plaintiff's claim for breach of fair representation based on the allegation that Hoffman told

21  Gallo and the arbitrator not to reinstate Plaintiff is not barred by the statute of limitations. All

22  other LMRA claims are barred and the Court will grant Defendant's motion for summary

23  judgment with respect to those barred claims.

24       **C.      Merits of Plaintiff's Remaining LMRA Claim**

25       Next, the Court turns to the merits of Plaintiff's remaining LMRA claim. Defendant

26  argues it is entitled to summary judgment because (1) the Union did not breach its duty of fair

27  representation in handling the grievance and (2) Gallo did not breach the collective bargaining

28  agreement by terminating Plaintiff's employment. (ECF No. 23 at 15-23).

1                    1.      Breaches of Duty of Fair Representation

2          "A breach of the statutory duty of fair representation occurs only when a union's conduct

3   toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."

4   *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). "Whether a union acted arbitrarily, discriminatorily or in

5   bad faith requires a separate analysis, because each of these requirements represents a distinct and

6   separate obligation." *Simo v. Union of Needletrades, Indus. & Textile Employees, Sw. Dist.*

7   *Council*, 322 F.3d 602, 617 (9th Cir. 2003). "[A] union's actions are arbitrary only if, in light of

8   the factual and legal landscape at the time of the union's actions, the union's behavior is so far

9   outside a wide range of reasonableness, as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*,

10  499 U.S. 65, 67 (1991) (internal quotation marks and citation omitted). "Whereas the arbitrariness

11  analysis looks to the objective adequacy of the Union's conduct, the discrimination and bad faith

12  analyses look to the subjective motivation of the Union officials." *Simo*, 322 F.3d at 618. "A

13  union's decision to discriminate against its members on an impermissible basis will violate the

14  duty of fair representation only where the aggrieved members set forth 'substantial evidence of

15  discrimination that is intentional, severe, and unrelated to legitimate union objectives.'" *Demetris*

16  *v. Transp. Workers Union of Am., AFL-CIO*, 862 F.3d 799, 806 (9th Cir. 2017) (quoting

17  *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274,

18  301 (1971)). "To state a plausible claim that [a union] breached its duty of fair representation

19  through bad-faith conduct, [a plaintiff] must plead facts that, if true, show substantial evidence of

20  fraud, deceitful action or dishonest conduct." *Demetris*, at 808.

21         Viewing the evidence in the light most favorable to Plaintiff, the non-moving party, the

22  Court finds that a rationale jury could find that the Union breached its duty of fair representation

23  by telling the company and arbitrator off the record not to reinstate Plaintiff.  A rationale jury

24  could determine that it is deceitful and dishonest for a union official to argue in favor of an

25  employee's reinstatement in public but against him while off the record.

26                    2.      Claims Against Employer

27         Next, Defendant claims it is entitled to summary judgment on the ground that the

28  company did not violate the collective bargaining agreement by terminating Plaintiff's

1   employment.  (ECF No. 23 at 23).  Defendant's argument on this point is a single paragraph that

2   points to the fact that "Mr. Eshun violently attacked a coworker," and that "[d]espite the Union's

3   best efforts to win Mr. Eshun's job back, a well-respected and experienced arbitrator found that

4   the Company had just cause to terminate Mr. Eshun's employment."  Defendant also puts in a

5   footnote an acknowledgment that it took the opposite position at the arbitration. (ECF No. 23 at

6   23) ("The Union acknowledges the obvious fact that this position conflicts with the position it

7   took during the grievance process. It suffices to state that the Union occupies a different role as a

8   defendant in this litigation than it did when it was Plaintiff's advocate during the grievance

9   process.").

10      The Court declines to grant summary judgment on this basis.  Far from being beyond

11  dispute, this issue was the subject of a lengthy arbitration where the Union itself represented that

12  the Company *did* violate the collective bargaining agreement by terminating Plaintiff. Moreover,

13  Plaintiff has put forth disputed facts regarding his culpability in the altercation. Defendant has

14  failed to meet its burden on summary judgment to show that it is undisputed that the Company

15  did not violate the collective bargaining agreement by terminating him. *See* Fed. R. Civ. P. 56(a)

16  ("The court shall grant summary judgment if the movant *shows* that . . . the movant is entitled to

17  judgment as a matter of law." (emphasis added)).

18      Accordingly, the Court denies summary judgment on the sole claim that the Union

19  breached its duty of fair representation when its representative, Mr. Hoffman, allegedly told the

20  arbitrator off the record to fire Plaintiff and reinstate Mr. Rose.[11]

21      **D.    FEHA Claim**

22      Defendant argues that Plaintiff's FEHA discrimination claim fails on the merits because

23  he does not show he "was singled out and treated less favorably than others similarly situated on

24  account of race or any other criterion impermissible under the statute." (ECF No. 23 at 25)

25  (quoting *Beck v. United Food & Com. Workers Union*, Local 99, 506 F.3d 874, 882 (9th Cir.

26  2007)).

27

28  [11] Again, the Court is only finding there is a dispute of fact as to this claim that is sufficient under the legal standards to proceed to a jury.  It is not making any determination as to the weight of the evidence regarding that allegation.

The California Court of Appeals has discussed what makes others *similarly situated* for FEHA purposes:

> Plaintiffs in FEHA cases can prove their cases by presenting either direct evidence, such as statements or admissions, or circumstantial evidence, such as comparative or statistical evidence.
>
> Comparative evidence is evidence that the plaintiff was treated differently from others who were similarly situated but are outside the plaintiff's protected class. Evidence that an employer treated similarly situated employees outside the plaintiff's protected class more favorably is probative of the employer's discriminatory or retaliatory intent.
>
> To be probative, comparative data must be directed at showing disparate treatment between employees who are similarly situated to the plaintiff in all relevant respects. In general, individuals are similarly situated when they have similar jobs and display similar conduct.

*Gupta v. Trustees of Cal. State Univ.*, 40 Cal. App. 5th 510, 519–20 (cleaned up).

Defendant argues that Plaintiff "does not provide any direct or circumstantial evidence that Mr. Hoffman's alleged actions were based on a protected characteristic, such as Mr. Eshun's race, age, or sex." (ECF No. 23 at 25).

The Court agrees that Plaintiff does not provide any direct evidence, such as statements or admissions, or discrimination.

Regarding circumstantial evidence, the Court finds that Plaintiff's sole piece of evidence of racial discrimination, which is the allegation that Mr. Rose was treated differently based on his race, is insufficient to prove this claim. Plaintiff, at times, alleges racial discrimination because he is black and African and was treated differently than Rose, who is white. (ECF No. 38 at 4). However, Rose was not so similarly situated to Plaintiff to be a probative comparison in this discrimination case. Again, "[t]o be probative, comparative data must be directed at showing disparate treatment between employees who are similarly situated to the plaintiff in *all* relevant respects. In general, individuals are similarly situated when they have similar jobs and *display similar conduct*." (emphases added). Here, however, it is undisputed that Plaintiff physically accosted Rose. Even if Plaintiff is correct that he had cause to do so, and that such an altercation was not sufficient cause for his termination, this difference in conduct prevents Mr. Rose's

1    disparate treatment to be a sufficient basis for a racial discrimination claim against the Union.

2           Thus, Plaintiff has failed to make a prima-facie case for discrimination. As such,

3    Plaintiff's state-law discrimination claim fails, and the Court will grant summary judgment to

4    Defendant with respect to Plaintiff's FEHA claim.

5           **E.      Plaintiff's Motion for Summary Judgment**

6           Plaintiff also filed a motion for summary judgment. (ECF No. 25). As discussed above,

7    Plaintiff's remaining claim is against Defendant for breaching its duty of fair representation by

8    allegedly telling Gallo and the arbitrator off the record not to reinstate Plaintiff. As discussed

9    above, Defendant has put forward disputed evidence regarding this fact, including declarations

10   from the two persons who allegedly made the statements denying that they made such statements.

11   The Court finds that disputes of fact preclude summary judgment in favor of Plaintiff on this

12   claim. Therefore, the Court will deny Plaintiff's motion for summary judgment.

13   **IV.   CONCLUSION**

14          Plaintiff and Defendant filed cross-motions for summary judgment. As discussed above,

15   Defendant's motion for summary judgment is denied with respect to Plaintiff's claim under the

16   LMRA that Defendant breached its duty of fair representation when its representative, Mr.

17   Hoffman, allegedly told Gallo and the arbitrator off the record not to reinstate him. Defendant's

18   motion for summary judgment is otherwise granted. Plaintiff's motion for summary judgment is

19   denied.

20          In addition, the Court will require the parties to attend either a settlement conference or

21   mediation. *See United States v. U.S. Dist. Court for N. Mariana Islands*, 694 F.3d 1051, 1057

22   (9th Cir. 2012), *as amended* (Oct. 16, 2012) ("We conclude that the district court has broad

23   authority to compel participation in mandatory settlement conference."). A representative of

24   Defendant with the authority to bind it must be present or immediately available during the

25   settlement conference or mediation. *Id.* at 1057-58; 28 U.S.C. § 473(b)(5); Fed. R. Civ. P.

26   16(c)(1) ("If appropriate, the court may require that a party or its representative be present or

27   reasonably available by other means to consider possible settlement.").

28   *///*

1    Accordingly, IT IS ORDERED:

2       1.  Plaintiffs' motion for summary judgment (ECF No. 22) is DENIED;

3       2.  Defendant's motion for summary judgment (ECF No. 25) is GRANTED, IN PART,

4          and DENIED, IN PART, as set forth above;

5       3.  The parties shall participate in a settlement conference or a mediation as set forth

6          above. The parties shall meet and confer to decide whether will participate in a

7          settlement conference before another magistrate judge of this court or before a private

8          mediator of their choosing. Within fourteen days, the parties shall file a joint statement

9          that informs the Court which option they have selected or that they have failed to

10         reach an agreement;[12] and

11      4.  The Clerk of the Court is directed to correct the docket to indicate that the Defendant,

12         Local Union No. 17, is also known as United Steel, Paper and Forestry, Rubber,

13         Manufacturing, Energy, Allied Industrial and Service Workers International Union,

14         AFL-CIO, CLC, Local 17.

15

16   IT IS SO ORDERED.

17      Dated:  __December 14, 2020__      /s/ _Erica P. Grosjean_

18                                     UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

---

28   [12] The Court will set the remaining schedule for this action if the parties do not settle after such a conference.